USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/2/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

AMR CORPORATION, et al.,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOHN KRAKOWSKI, et al.,

                    Plaintiffs-Appellants,


          -against-                                              18-cv-06187 (LAK)


AMERICAN AIRLINES, INC., et al.,

                    Defendants-Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


Appearances:


          Allen P. Press
          JACOBSON PRESS P.C.
          *Attorney for Plaintiffs-Appellants*


          Mark W. Robertson
          Sloane Ackerman
          Robert A. Siegel
          O'MELVENY & MYERS LLP
          *Attorneys for Defendant-Appellee American Airlines, Inc.*


          Steven K. Hoffman
          Daniel M. Rosenthal
          JAMES & HOFFMAN, P.C.
          *Attorneys for Defendant-Appellee Allied Pilots Association*

LEWIS A. KAPLAN, *District Judge.*

This high-flying bankruptcy appeal arises from a dispute between three airline pilots

(the "TWA pilots"), their labor union Allied Pilots Association ("APA"), and their current employer

American Airlines ("AA"). The TWA pilots, who worked for Trans World Airlines, Inc. ("TWA")

until it merged with AA, allege on behalf of a putative class of similarly situated individuals that

APA breached its duty of fair representation throughout an arbitration process involving AA and that

APA colluded in this conduct. The United States Bankruptcy Court for the Southern District of New

York (Lane, *J.*) dismissed some of these claims under Rule 12(b)(6) at the pleading stage and

decided the remainder in the defendants' favor on summary judgment. I affirm.

*Facts*[1]

A.    *The TWA-AA Merger*

The airline industry hit a rough patch in the early 2000s. High oil prices, an economic

crisis, and changes wrought by the terrorist attacks of 9/11 caused many major airlines to cut back

their operations or fold into bankruptcy.[2] Among the struggling carriers was TWA, an airline with

a St. Louis hub that sold many of its assets to AA in 2001.[3] At the time of the sale, TWA employed

---

[1]       I take the following facts primarily from the statements of material facts. The TWA pilots neglected to include their responses to AA's statement of material facts on the record, while AA filed that statement – but not the TWA pilots' responses – alongside its brief. I therefore reviewed the response statement from the bankruptcy court's docket. *See* Bkr. Ct. Docket, DI-122 (hereinafter "AA SMF").

[2]       *See* Elad Ben-Yosef, *The Evolution of the US Airline Industry: Technology, Entry, and Market Structure – Three Revolutions*, 72 J. AIR L. & COMM. 305, 314-15 & n.64 (2007).

[3]       AA SMF ¶¶ 1-2.

roughly 1,300 pilots, 650 of whom were based in St. Louis.[4]

APA is a union authorized to collectively bargain on behalf of AA pilots, a group that includes, following the sale, former TWA pilots.[5] At the time of the TWA sale, APA and AA added to their existing CBA an agreement called "Supplement CC," which governed the integration of the TWA pilots into AA's workforce.[6] Supplement CC specified that, for the purpose of AA's "seniority list," a ranking of pilots by years of experience that has significant implications for pay and scheduling preferences,[7] the pilots would not receive credit for the full number of years they served at TWA.[8] The pilots would, however, receive the benefit of a "protective fence" around the St. Louis base.[9] The metaphorical fence guaranteed former TWA pilots at that base a certain number of captain positions and preferential bidding rights.[10]

---

[4] Modified Supplemental Class Action Complaint for Damages and Declaratory Relief ("MSC") ¶¶ 9, 11 [DI 48].

[5] *Id.* ¶ 5.

[6] AA SMF ¶ 2.

[7] As one website explains, "[t]he three most important things in the airline piloting profession are seniority, seniority[,] and seniority." Joel Freeman, *How Becoming an Airline Pilot Works*, HOWSTUFFWORKS, https://science.howstuffworks.com/transport/flight/modern/pilot6.htm.

[8] AA SMF ¶ 2.

[9] *Id.*

[10] *Id.*

*B.    AA's Bankruptcy and Subsequent CBA Negotiations*

AA and its corporate parent, AMR, filed for bankruptcy in the SDNY in 2011.[11] In February 2012, AA began the process of abrogating the CBA with its pilots, including Supplement CC, under 11 U.S.C. § 1113.[12] It served APA with a term sheet indicating that it would eliminate Supplement CC and close the St. Louis base that year.[13] The proposal stated that the TWA pilots would retain their current places on the seniority list and that AA would consider "[p]ossible protections for TWA pilots" to replace those provided by Supplement CC.[14]

APA's board of directors at this time included two locally selected members from each of several pilot bases.[15] In St. Louis – where around 93 percent of AA pilots formerly were of TWA – the representatives were Keith Bounds and Doug Gabel, both TWA pilots.[16] Gabel had been a union representative for over a decade,[17] and Bounds was an experienced representative as well.[18]

---

[11]
    *Id.* ¶ 3.

[12]
    Plaintiffs' Response to APA's Statement of Material Facts, and Their Statement of Additional Material Facts ("APA SMF") ¶ 4 [TWA Pilot App. 143].

[13]
    *Id.*

[14]
    *Id.*

[15]
    *Id.* ¶¶ 9-10.

[16]
    *Id.* ¶¶ 11-12.

[17]
    *Id.* ¶ 13.

[18]
    *Id.* ¶ 16.  At some point in 2012, Marcus Spiegel, also a TWA pilot, replaced the term-limited Gabel. *Id.* ¶ 17.

Upon receiving the term sheet from AA, APA's board approved a motion proposing three neutral arbitrators to decide how to protect the TWA pilots if Supplement CC were eliminated.[19] The motion proposed also that the arbitrators would be unable to make any changes to the AA seniority list.[20] APA informed its members of this motion the day the board approved it.[21]

In September 2012, the bankruptcy court granted AA leave to abrogate the CBA, including Supplement CC.[22] Three months later, AA and APA, with significant and frequent input from Gabel and Bounds, negotiated a new CBA.[23] A side letter agreement, LOA 12-05, provided that AA would have the exclusive right to close the St. Louis base and that "a dispute resolution procedure is necessary to determine what alternative contractual rights should be provided to TWA pilots as [a] result of the loss of flying opportunities due to the termination of Supplement CC and the closing of the [St. Louis] base."[24] The dispute resolution procedure would be "final and binding interest arbitration" before a panel of three neutral arbitrators led by Richard Bloch.[25] AA and APA

---

[19]

*Id.* ¶ 5.

[20]

*Id.* ¶ 6.

[21]

*Id.*

[22]

AA SMF ¶ 2.

[23]

*Id.* ¶¶ 4-5; APA SMF ¶¶ 18-19.

[24]

AA SMF ¶ 5.

[25]

*Id.* ¶ 6.

agreed that Bloch was a prominent arbitrator and familiar to industry practitioners.[26] LOA 12-05

provided additionally that "[t]he arbitrators shall decide what non-economic conditions should be

provided to TWA pilots," while specifying that "[i]n no event shall the arbitrators have authority to

modify [AA's seniority list] . . . or impose material costs beyond training costs on [AA]."[27]

Gabel and Bounds approved of all the language in LOA 12-05 except, the TWA pilots

assert, the limitation on changes to the seniority list.[28] They did not object to the selection of Bloch,[29]

and at least Gabel heard feedback from other TWA pilots before determining Bloch would be "a

good choice."[30] APA's membership ratified the new CBA, and the bankruptcy court approved the

CBA and LOA 12-05.[31] 81 percent of the St. Louis pilots voted in favor of the CBA.[32]

C.    *The LOA 12-05 Arbitration*

In January 2013, AA and APA reached a protocol agreement for the upcoming LOA

---

[26]
   *Id.*

[27]
   *Id.* ¶ 7.

[28]
   APA SMF ¶ 20.

[29]
   *Id.* ¶ 42.

[30]
   *Id.* ¶ 41.

[31]
   *Id.* ¶¶ 8, 10, 60.

[32]
   *Id.* ¶ 9. AA and APA agreed at the time, and agree now, that a "yes" vote would not
   preclude the sort of duty of fair representation claims underlying this litigation. *Id.*

12-05 arbitration.[33] It specified that Stephen Goldberg and Ira Jaffe – both nationally recognized arbitrators recommended to APA by Gabel – would round out the arbitration panel.[34] Gabel recommended Goldberg because he had previously ruled in favor of APA in a $23 million arbitration against AA.[35] No TWA pilot complained to Gabel about Goldberg or Jaffe.[36]

The protocol agreement provided that the TWA pilots and all other AA pilots would be represented by separate committees with their own counsel.[37] There is no dispute that AA played no role whatsoever in selecting the committees or their counsel.[38] Gabel chaired the TWA pilots committee and selected its members – all TWA pilots – and the committee chose as its legal counsel John O'B. Clarke, who had argued three cases involving the same labor statutes before the Supreme Court, and represented the TWA pilot several other times both before and after the arbitration.[39] The AA pilots committee included AA pilots not formerly of TWA.[40] It selected Wesley Kennedy as

---

[33]

AA SMF ¶ 11.

[34]

*Id.* ¶ 12; APA SMF ¶ 51.

[35]

APA SMF ¶ 52.

[36]

*Id.* ¶ 53.

[37]

AA SMF ¶ 14.

[38]

*Id.* ¶¶ 17, 20.

[39]

*Id.* ¶¶ 16, 19; APA SMF ¶¶ 25, 61-66.

[40]

AA SMF ¶¶ 15, 19.

counsel.[41]   The parties dispute whether APA influenced the selection of counsel for both committees,[42] and the TWA pilots committee asserted at the time that Kennedy was conflicted because he was advocating on behalf of all AA pilots in a separate arbitration involving AA's merger with U.S. Airways.[43]   APA hired an attorney specializing in ethics to address this concern, and the attorney concluded there was no conflict.[44]   Despite the committee structure, APA informed the TWA pilots well in advance that they had the right to participate individually in the arbitration.[45] Hundreds did by attending the hearings, accessing the arbitration materials, and making written submissions or oral presentations.[46]

   The arbitration began on April 2, 2013.   The TWA pilots committee submitted briefing, presented and cross-examined witnesses, and introduced evidence throughout.[47]   It argued that LOA 12-05 required the panel to "replicate" Supplement CC's protections.[48]   The panel disagreed, reading LOA 12-05 to require "alternative" or "substitute" protections and finding that

---

[41]

   *Id.*

[42]

   APA SMF ¶ 60.

[43]

   *Id.* ¶ 72.

[44]

   *Id.* ¶¶ 75, 78.  AA was unaware of the allegations involving Kennedy.  AA SMF ¶ 21.

[45]

   APA SMF ¶ 79.

[46]

   *Id.* ¶¶ 87-88; AA SMF ¶ 25.

[47]

   AA SMF ¶¶ 23-24

[48]

   APA SMF ¶¶ 104-07.

replicating Supplement CC would be impossible because the St. Louis base was closing.[49] The TWA pilots sought also to reassert their TWA hire dates for the purpose of AA's seniority list.[50] Objecting, AA pointed to LOA 12-05's stipulation that the panel could "[i]n no event" modify the seniority list.[51] The panel agreed with AA.[52] As an alternative to these proposals, and in opposing the replication standard, the AA pilots committee suggested that TWA pilots receive "pay protection" – effectively, a guarantee that 340 TWA pilots earn a captain's salary.[53] AA objected to this proposal as exceeding the panel's jurisdiction to "decide what *non-economic* conditions" should be awarded.[54] The panel agreed with AA.[55]

Additionally, the TWA pilots made two "procedural" proposals for future arbitrations: that the panel establish a "multi-party adjustment board" to resolve disputes arising from their proposed "Revised Supplement CC," and that TWA pilots be granted "separate party status" in any future seniority-list negotiation.[56] APA submitted a three-page brief objecting to both proposals as

---

[49] *Id.* ¶ 109.

[50] *Id.* ¶ 118.

[51] *Id.* ¶ 120.

[52] *Id.* ¶ 122.

[53] *Id.* ¶ 112.

[54] *Id.* ¶ 113 (emphasis added).

[55] *Id.* ¶ 116.

[56] *Id.* ¶¶ 124-27.

outside the arbitrators' jurisdiction based on LOA 12-05.[57]  The panel disagreed with APA's

jurisdictional argument but nonetheless declined to adopt the proposals on their merits.[58]

Based on the foregoing, the panel issued a unanimous merits award, the contents of

which are not detailed in the stipulations and are not relevant here.[59]  AA and APA, working with

the TWA and AA pilots committees, drafted contractual language to implement the award.[60]

D.    *Procedural History*

Dissatisfied with the arbitration process, the TWA pilots filed a complaint against

APA and AA in the Eastern District of Missouri in 2012.[61]  The case was transferred to this district's

bankruptcy court in 2013.[62]  That court dismissed the complaint with prejudice in 2014 while

allowing the TWA pilots to amend certain claims in their then-pending Modified Supplemental Class

Action Complaint for Damages and Declaratory Relief ("MSC").[63]  The primary allegation in the

MSC is that APA breached its duty of fair representation of the TWA pilots and AA colluded with

---

[57]
    *Id.* ¶ 124.

[58]
    *Id.* ¶ 130.

[59]
    *Id.* ¶¶ 131-32.

[60]
    *Id.* ¶¶ 133-34.

[61]
    Docket No. 13-01283 (Bankr. S.D.N.Y. 2013) at 4 [TWA Pilot App. 4].

[62]
    *Id.*

[63]
    Order at 1-2 [TWA Pilot App. 37-38].

APA in its alleged breaches.

In 2015, the bankruptcy court dismissed the MSC in part. Drawing from the MSC's own organization, the court explained that the single breach count relied on ten alleged breaches.[64] Treating these as effectively separate claims, the court dismissed the claims that APA:

1. Failed to bargain on behalf of the TWA pilots over the abrogation of Supplement CC;
2. Agreed with AA to abrogate Supplement CC without securing equivalent job protections;
3. Falsely represented to the bankruptcy court that the LOA 12-05 arbitration's purpose was to "replicate" Supplement CC's protections;
4. Precluded the panel from addressing the seniority list and failed to require that the panel "replicate" Supplement CC's protections.[65]

However, the court allowed the TWA pilots to proceed with their theories that APA:

5. Selected the arbitrators without input from the TWA pilots;
6. Selected the arbitration participants without such input;
7. Selected the lawyers without such input;
8. Hired Kennedy to represent the AA pilots despite his alleged conflicts;
9. Pursued through the AA pilots committee a position adverse to the TWA pilots;
10. Objected to the TWA pilots committee's procedural proposals.[66]

Following discovery, the bankruptcy court found on summary judgment for the defendants on all six remaining claims.[67] The TWA pilots timely appealed.

---

[64] Memorandum of Decision ("Dismissal Op.") at 14 [TWA Pilot App. 69] (citing MSC ¶ 48 [TWA Pilot App. 33]).

[65] Id. [TWA Pilot App. 69]; MSC ¶ 48 [TWA Pilot App. 33].

[66] Dismissal Op. at 14 [TWA Pilot App. 69]; MSC ¶ 48 [TWA Pilot App. 33-34].

[67] Memorandum of Decision ("Summary Judgment Op.") at 2-3 [TWA Pilot App. 81-82].

*Discussion*

"District courts . . . review the legal conclusions of the Bankruptcy Court *de novo*, and its findings of fact under the clearly erroneous standard."[68]  I assume familiarity with the standards governing motions to dismiss under Rule 12(b)(6) and motions for summary judgment under Rule 56.[69]

The Supreme Court has been somewhat unclear about the precise source of a union's duty of fair representation.[70]  But there is no doubt the duty exists.  For our purposes, it is simple. To state a claim for a breach of the duty of fair representation, plaintiffs must allege (1) that the union's "conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith," and (2) "a causal connection between the union's wrongful conduct and their injuries."[71]  "A union's actions are 'arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be

---

[68]

See, e.g., *In re Motors Liquidation Co.*, 428 B.R. 43, 51 (S.D.N.Y. 2010) (citing *AppliedTheory Corp. v. Halifax Fund, L.P.* (*In re AppliedTheory Corp.*), 493 F.3d 82, 85 (2d Cir. 2007)).

[69]

The TWA pilots argue for a more forgiving pleading standard than *Iqbal* and *Twombly*'s plausibility test.  They note that the Supreme Court stated in *Czosek v. O'Mara*, a 1970 decision predating these more recent cases, that "where the courts are called upon to fulfill their role as the primary guardians of the duty of fair representation, complaint should be construed to avoid dismissals." 397 U.S. 25, 27 (1970).  Nothing about this language is at odds with the plausibility test or purports to create a different standard.

[70]

See *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76 (1991) (describing the doctrine as a "duty grounded in federal statutes, [for which] federal law therefore governs").

[71]

*White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 179 (2d Cir. 2001) (first quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44, and then quoting *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir. 1998)).

irrational."[72] Mere "tactical errors" and "even negligence" do not suffice for arbitrariness.[73] As to "discriminatory," "'substantial evidence' [must] indicate[] that [the union] engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives."[74] "Bad faith, which 'encompasses fraud, dishonesty, and other intentionally misleading conduct,' requires [well-pleaded factual allegations] that the union acted with 'an improper intent, purpose, or motive.'"[75]

The TWA pilots argue that the bankruptcy court failed to construe the complaint as a whole by analyzing separately the ten components of the single, sprawling breach count.[76] This argument is meritless.[77] The court in fact drew its organization from the MSC itself,[78] and the TWA pilots largely follow that framing in their brief. As viewing the components of the alleged breach

---

[72]

Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (quoting O'Neill, 499 U.S. at 67 (citation and quotation marks omitted)).

[73]

Id.

[74]

Id. (quoting Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge, 403 U.S. 274, 301 (1971)).

[75]

Id. at 709-10 (quoting Spellacy, 156 F.3d at 126).

[76]

Appellant Br. 29-31.

[77]

No case to which the TWA pilots point forbids courts from taking this approach. In fact, the Second Circuit analyzed a duty of fair representation claim similarly in Vaughn v. Air Line Pilots Association, International. See 604 F.3d at 710-12. Moreover, in rejecting this argument below, the bankruptcy court asserted that it "has examined each of the [TWA pilots'] allegations and has found no basis for the individual claims asserted . . . . This assessment does not change whether those allegations are evaluated as a whole or parsed individually." Summary Judgment Op. at 53 n.41 [TWA Pilot App. 132] (emphasis added).

[78]

See MSC ¶ 48 [TWA Pilot App. 33].

separately is a sensible way of construing the MSC as a whole, I do so here.

## I.    The Bankruptcy Court Correctly Dismissed the First Four Claims.

The first four claims were resolved on a motion to dismiss. The analysis that follows therefore ignores the discovery record and assumes the allegations in the MSC to be true.

### A.    Claims One and Two

Claims one and two center on the abrogation of Supplement CC: that APA (1) failed to bargain on behalf of the TWA pilots over the abrogation of Supplement CC, and (2) agreed to abrogate Supplement CC without securing equivalent job protections. The bankruptcy court held APA's alleged conduct, even if true, could not have injured the TWA pilots because there was no true bargaining or agreement over Supplement CC's termination – the court abrogated it.[79] Moreover, in taking judicial notice of the abrogation proceedings previously before it, the court found that "APA opposed the termination of the collective bargaining agreement at every turn."[80]

The TWA pilots devote a single paragraph in their brief to each of their first two claims. As to the first, they argue that the bankruptcy court "ignor[ed] the fact that APA had agreed to terminate Supplement CC before the CBA was abrogated."[81] But the bankruptcy court observed that any "agreement" to terminate Supplement CC "was only a piece of the negotiations" and was

---

[79]     Dismissal Op. at 14-16 [TWA Pilot App. 69-71].

[80]     *Id.* at 15.

[81]     Appellant Br. 31.

not binding in any sense.[82]  For that reason, APA's decision to enter into a nonbinding agreement, when the court itself abrogated Supplement CC, cannot satisfy the causation requirement for a duty of fair representation claim.

On the second claim, the TWA pilots argue that "[a]brogation of the CBA [including Supplement CC] did not preclude APA from negotiating with [AA] for 'equivalent job protections.'"[83]  Again, this argument fails because the bankruptcy court abrogated Supplement CC.

In effect, the TWA pilots would hold APA accountable for something it did not do. The dismissal of the first two claims is affirmed.

### B.    Claim Three

Claim three fares no better.  The TWA pilots allege that APA and AA falsely told the bankruptcy court during a hearing that the LOA 12-05 arbitration was intended to "replicate" Supplement CC's protections.[84]  They appear to read "replicate" as literally as one can – a promise to produce an exact copy of Supplement CC's protections.  Thus, their claim is that APA and AA misled the bankruptcy court into believing that it would duplicate Supplement CC via arbitration, and that the court therefore approved LOA 12-05 when it otherwise would not have.

In rejecting this claim, the bankruptcy court relied on the text of LOA 12-05, which,

---

[82]      Dismissal Op. at 15-16 [TWA Pilot App. 70-71].

[83]      Appellant Br. 31.

[84]      MSC ¶¶ 22, 48©.

of course, had been presented to it years earlier when it approved the letter.[85] The LOA states that

the purpose of the arbitration was "determin[ing] what *alternative* contractual rights should be

provided to TWA Pilots as a result of the loss of flying opportunities due to [the] termination of

Supplement CC and the closing of the [St. Louis] base."[86] The court observed also that the word

"replicate" appears nowhere in LOA 12-05, and it found impossible the premise that the arbitration

was intended to "replicate" Supplement CC because the St. Louis base was closing and the protective

fence no longer could exist.[87]

The TWA pilots now argue that the bankruptcy court erroneously dismissed their

claim because literal replication was the true meaning of LOA 12-05.[88] This argument in fact

---

[85]

Dismissal Op. at 17 [TWA Pilot App. 72]. This document was not attached to the MSC, but the court took judicial notice of its contents. The TWA pilots have waived any objection to this decision by not challenging it in their brief. I find, alternatively, that the court properly took judicial notice of the contents of the letter. I find also that the MSC incorporated LOA 12-05 by reference. Claim three references "LOA 12-05" by name, *see* MSC ¶ 48(c) [TWA Pilot App. 33], and the LOA is highly relevant to the allegations throughout the MSC. "In most instances where [incorporation by reference applies], the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim – was not attached to the complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

[86]

Dismissal Op. at 17 [TWA Pilot App. 72] (citation omitted).

[87]

*Id.* at 18-19.

[88]

Of course, the underlying claim is that the court prior to approving LOA 12-05 *did* understand it to require literal replication. This leaves the TWA pilots in the awkward position of arguing that the same court that once was duped into believing that "replicate" *should be* taken literally erroneously dismissed their claim based on its then-present belief that "replicate" *should not be* taken literally, and in fact asserted that it never understood LOA 12-05 in that way. By appealing this issue, the TWA pilots are effectively accusing the court of misrepresenting its initial understanding of what LOA 12-05 required.

undermines their claim. The MSC alleges that APA and AA *misrepresented* to the court that the arbitration would replicate Supplement CC's protections. This means the MSC's position is that the true intent of LOA 12-05 arbitration was *not* literal replication. If we agree with the TWA pilots' current argument that literal replication was the true meaning of LOA 12-05, there was no misrepresentation – and therefore no breach by APA – and their claim must be dismissed.

Even setting aside this confusion, the TWA pilots' unnatural reading of "replicate" raises several concerns. Chief among them is that it is utterly implausible that APA promised to do the impossible by building a protective fence around an AA hub that was slated for closure. One cannot build even a metaphorical fence around something that does not exist. Agreeing with the TWA pilots would require further a belief that APA and AA left no hint in LOA 12-05 of their agreement to do the impossible, but instead revealed their hidden intent in a stray comment before disclaiming that position as soon as the arbitration began.[89] This is beyond implausible.[90]

---

[89] In their brief, the TWA pilots attempt to add further evidence that AA and APA intended a literal replication standard. In their words, the evidence comes from "discovery conducted after [the bankruptcy court's] erroneous ruling," Appellant Br. 32 – *i.e.*, facts not alleged in the MSC. They cite to statements from APA's general counsel, none in the text of LOA 12-05, that the arbitration would create protections "just like," "equivalent to," or "not better or worse than" the prior ones. *Id.* (emphasis omitted). Even if it were appropriate to consider this evidence on appeal from a motion to dismiss – it is not – no fair-minded reader could conclude these statements indicate that APA and AA agreed via LOA 12-05 to replicate Supplement CC. Rather, these comments indicate that the parties believed LOA 12-05 would create, as it stated, "alternative" protections.

[90] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

C. *Claim Four*

The bankruptcy court dismissed also the claim that APA breached its duty by precluding the arbitrators via LOA 12-05 from addressing the seniority list and failing to require them to "replicate" Supplement CC's protections. It found that even if this allegation were true, the TWA pilots would not be entitled to relief because the claim incorrectly assumes that the only satisfactory remedies in arbitration were changing the seniority list and replicating Supplement CC's protections.[91] Instead, the court found, APA's duty was to balance the interests of two groups of pilots, and the TWA pilots had not alleged APA discriminated in balancing those interests.[92]

To begin, the half of this claim that faults APA for not requiring the arbitrators to impossibly "replicate" Supplement CC fails for the same reasons noted above. And the TWA pilots do not argue that we should read "replicate" more reasonably for the purpose of this claim.[93] In fact, they do not advance any argument at all for why the bankruptcy court's decision to dismiss this claim

---

[91] Dismissal Op. 19 [TWA Pilot App. 74].

[92] *Id.* at 20.

[93] Even if they did, the MSC alleges that the purpose of the arbitration was resolving the "TWA pilot issue" – *i.e.*, the hole left by Supplement CC's abrogation. MSC ¶ 19 [TWA Pilot App. 27]. The TWA pilots thus cannot argue that APA's decision to sign LOA 12-05 precluded them from finding an alternative to Supplement CC. Moreover, "a showing that union action has disadvantaged a group of members, without more, does not establish a breach of the duty of fair representation" because "a union by necessity must differentiate among its members in a variety of contexts." *Flight Attendants in Reunion v. Am. Airlines, Inc.*, 813 F.3d 468, 473 (2d Cir. 2016) (quoting *Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 221 (2d Cir. 1989)). Even construed generously, the MSC simply does not allege the necessary "substantial evidence" that APA's conduct was "intentional, severe, and unrelated to legitimate union objectives." *Id.* (quoting *Lockridge*, 403 U.S. at 301).

was erroneous; their argument focuses entirely on the seniority list.[94]

As to APA's agreement precluding the arbitrators from revisiting the seniority list, the bankruptcy court concluded that APA had no duty to demand revisiting it through the arbitration because doing so would harm the AA pilots by lowering their positions on the list. While the TWA pilots find this reasoning "incorrect," they make no clear argument for why this is so.[95]

Binding precedent supports the bankruptcy court's holding. Under the similar facts of *Flight Attendants in Reunion v. American Airlines*,[96] TWA's flight attendants were placed at the bottom of AA's seniority list after the two airlines merged.[97] When AA and U.S. Airways agreed to merge in 2013, the AA flight attendants' union entered into negotiations with the U.S. Airways' attendants' union over integrating their seniority lists.[98] The U.S. Airways attendants' union argued that TWA attendants should be given seniority based on their TWA dates of hire, but the AA union threatened that the U.S. Airways attendants might not be credited for their years with U.S. Airways if they maintained that position.[99] The unions subsequently agreed to integrate their seniority lists,

---

[94]

*See* Appellant Br. 33-35.

[95]

*See id.*

[96]

813 F.3d 468.

[97]

*Id.* at 470-71.

[98]

*Id.* at 471.

[99]

*Id.*

which meant the TWA attendants would continue receiving no credit for their TWA years.[100]

The TWA attendants sued for breach of the duty of fair representation, and the Second Circuit affirmed the lower court's dismissal of that claim.[101] Based on the aforementioned facts, it held that "the union's decision not to reorder the existing seniority list at [AA] prior to the merger and to agree to integrate the two separate seniority lists based on each flight attendant's 'length of service' cannot fairly be described as either irrational or discriminatory, even though it ultimately, and unfortunately, disadvantaged the plaintiffs."[102] It found principally that the union could not be held liable for merely balancing its members' necessarily competing interests when refusing to modify its existing seniority list in the course of negotiating the integration of that list with another.[103] "[C]atapulting the former TWA flight attendants up the [AA] seniority list would have resulted in other [AA] flight attendants losing their relative seniority, and such a 'juggl[ing] [of] the existing seniority ladder . . . would have exposed [the union] to countervailing claims."[104]

The TWA pilots offer no reason why APA's decision was irrational, discriminatory, or in bad faith.[105] They assert only that the bankruptcy court's reasoning that seniority is a "zero sum

---

[100]

  *Id.*

[101]

  *Id.* at 472-75.

[102]

  *Id.* at 473-74.

[103]

  *Id.* at 474.

[104]

  *Id.* (quoting *Haerum*, 892 F.2d at 221).

[105]

  Appellant Br. 33-35.

game" was flawed. Whether the bankruptcy court engaged in an error of reasoning (it did not) is insufficient for reversal on *de novo* review. In any event, *Flight Attendants in Reunion* makes clear that declining to modify an existing seniority list to address past grievances when negotiating the integration of that list with another is not, without more, a breach of the duty of fair representation. As the TWA pilots make no effort to assert the additional facts necessary to advance their claim, they have waived any argument to that effect.[106]

\* \* \*

Nothing about this analysis changes when these four claims are viewed in the context of the entire MSC. The dismissal order is affirmed.

II.    *The Bankruptcy Court Correctly Entered Summary Judgment for APA on the Remaining Six Claims.*

The remaining six claims were resolved in AMA's favor in a summary judgment order. While the parties agree largely on the basic facts, there are several purported questions of material fact that the bankruptcy court resolved in its opinion. I introduce them where relevant in the sections that follow, mindful that I review the bankruptcy court's fact finding for clear error.[107]

---

[106]

Even then, and as noted with respect to the "replicate" theory, nothing in the MSC when construed generously in favor of the TWA pilots suggests that APA's decision was irrational, discriminatory, or in bad faith, particularly when it is compared to the factually similar decision blessed by the Second Circuit in *Flight Attendants in Reunion*.

[107]

*In re Motors*, 428 B.R. at 51(citing *In re AppliedTheory*, 493 F.3d at 85).

*A.*     *Claims Five, Six, Seven, and Eight*

As alleged in the MSC, claims five through eight charge APA with:

5.   Selecting the arbitrators without input from the TWA pilots;
6.   Selecting the arbitration participants without such input;
7.   Selecting the lawyers without such input;
8.   Hiring Kennedy to represent the AA pilots committee as counsel despite his alleged conflicts.

Each of these claims turns on APA's alleged role in setting up the arbitration process. None is meritorious. What follows is akin to a "greatest hits" version of their defects, a more comprehensive discussion of which is found in the bankruptcy court's opinion.

The TWA pilots have abandoned claim five by not advancing in their appellate brief any argument that the bankruptcy court resolved the claim erroneously against them. In addition, however, the TWA pilots' own stipulations defeat the claim. The parties agree that Gabel and Bounds, the TWA pilots' union representatives, approved of LOA 12-05's language naming Bloch as lead arbitrator. Gabel in fact determined Bloch would be "a good choice" after hearing feedback from other TWA pilots. Gabel himself recommended the remaining two arbitrators, one of whom had ruled in APA's favor in a $23 million arbitration against AA. Despite these stipulations, the TWA pilots theorize that APA controlled the TWA pilots committee and, thus, that the selection of the panel should be attributed to APA. The bankruptcy court found "no evidence to support [the] assertions that APA in some way controlled or directed the decisions made by the pilots committees."[108] Nothing the TWA pilots argue on appeal suggests this finding was clearly erroneous. As there is thus no dispute of material fact that APA played no role in the committee's

---

[108] Summary Judgment Op. at 22 [TWA Pilot App. 101].

decisionmaking, no reasonable jury could conclude that APA acted in an arbitrary, discriminatory, or bad-faith manner with respect to selecting the arbitrators – or that it acted at all. Nor could a reasonable jury conclude that APA caused the TWA pilots' injuries by sitting on the sidelines, or even that the composition of the arbitration panel caused any injuries to the TWA pilots.

      Claim six fails for similar reasons. The parties stipulate that the TWA pilots' St. Louis union representatives chose Gabel to chair their arbitration committee.[109] They stipulate also that Gabel selected the committee members, all of whom were TWA pilots.[110] It therefore is undisputed that the TWA pilots, not APA, selected the committee members. The stipulations reveal also that APA played no role in selecting the AA pilots committee, whose members the parties agree were selected by an AA pilot.[111] To whatever extent these stipulations do not demonstrate APA's nonparticipation, the bankruptcy court expressly found that APA did not select the committee members. As nothing the TWA pilots argue suggests this finding was clearly erroneous, claim six fails.[112] Even then, the TWA pilots do not argue, and no reasonable jury could infer from this record, that the committee members failed to perform their duties in a manner that injured the TWA pilots. The overwhelming evidence that the committees acted properly severs causation as a matter of law.

---

[109]

    APA SMF ¶ 24 [TWA Pilot App. 149].

[110]

    *Id.* ¶ 25.

[111]

    *Id.* ¶¶ 33-35; AA SMF ¶ 15.

[112]

    Moreover, the TWA pilots stipulate that "it would not have been fair for the former TWA pilots to participate in selecting the members of [the] AA Pilots Committee." APA SMF ¶ 36. That stipulation further absolves APA with regard to the AA pilots committee, as the TWA pilots concede APA had no duty to consider their input in forming that committee.

On claim seven, the TWA pilots object to a paragraph in the stipulated facts stating that each committee selected its own counsel.[113] But they do in fact concede that the committees selected their own counsel, as their only objection is to the assertion that the committees did so without influence from APA.[114] APA's influence, they argue, stems from the allegation, rejected above, that "[t]he TWA Pilot Committee was formed by APA as an AD Hoc Committee of itself."[115] The court below did not clearly err by finding that the committees chose their own counsel without APA's influence.[116] Moreover, the TWA pilots have failed to show causation, as they have not argued, and no evidence suggests, that the committee's decision to hire experienced counsel – who represented the TWA pilots in matters both before and after the arbitration – caused their injuries.

Claim eight, that APA hired the allegedly conflicted Kennedy to represent the AA pilots committee, fails for similar reasons. The bankruptcy court found that the AA pilots committee – not APA – hired Kennedy.[117] The TWA pilots point to no evidence contradicting this finding and continue resting on their argument that APA controlled the committees. Further, although I need not wade into Kennedy's alleged conflicts, they are de minimus at best, and an independent ethics attorney advised APA that they were not disqualifying. The TWA pilots have not explained how

---

[113]

Id. ¶¶ 61, 68.

[114]

Id. ¶ 61 [TWA Pilot App. 159].

[115]

Id.

[116]

Summary Judgment Op. at 21-22, 43-44 & nn. 31-32 [TWA Pilot App. 100-01, 122-23].

[117]

Id. at 44 n.32 ("[N]othing presented the [TWA pilots] suggests that APA controlled or otherwise dictated who the AA Pilots Committee should hire as counsel.").

APA's supposed decision to hire Kennedy was bad-faith conduct. And as for the previous three claims, there is no evidence that Kennedy's selection caused the TWA pilots any injury or that the process would have gone differently if the AA pilots committee had retained a different attorney.

### B. Claims Nine and Ten

The final two claims turn on APA's alleged conduct during the arbitration.

There is no merit to claim nine, viz, that APA pursued, through the AA pilots committee, a position in the arbitration designed to take jobs away from the TWA pilots when it should have attempted to "replicate" Supplement CC's protections. The lack of evidence that APA controlled the AA pilots committee is decisive. But the court below construed the claim more generously as one that APA failed to prevent the AA pilots committee from taking a position adverse to the TWA pilots.[118] This framing does not rescue the claim.

When a union is "faced with two groups of its members with objectives that [are] directly at odds . . . [s]ubmission of the impending dispute to arbitration [is] an equitable and reasonable method of resolving it," and not "arbitrary, discriminatory, in bad faith, or wholly outside the range of reasonableness."[119] It logically follows that dividing the members into committees is a reasonable way of working around such conflicts when a union negotiates with a third party on behalf of members with directly competing interests. The premise of APA's committee approach to the LOA 12-05 arbitration was that the TWA and AA pilots had conflicting goals. No matter how

---

[118]
        Summary Judgment Op. 46-49 [TWA Pilot App. 125-28].

[119]
        *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1107 (2d Cir. 1991).

the new CBA ultimately addressed the treatment of the TWA pilots, there would be winners and losers. When advantages to one group are disadvantages to another, balancing their interests is a zero-sum game.

Viewed in this light, it is easy to see why APA had no duty to control the committees' bargaining positions or to endorse the substantive positions of the TWA pilots. If a union submits a dispute to arbitration to avoid conflicts among its members and then advocates on behalf of some members to the detriment of others, that advocacy would defeat the purpose of the arbitration, and the union would expose itself to legal action by the members it sided against.[120] Agreeing with the TWA pilots would have stranded the union between Scylla and Charybdis – it would breach its duty of fair representation by taking sides, and it would breach it by not taking sides.

Even if we passed the duty hurdle, the TWA pilots have failed to show causation. The undisputed facts indicate that the TWA pilots vigorously pursued their positions on replicating Supplement CC's protections and rearranging the seniority list. That APA supporting their position would have swayed the arbitrators' views is extraordinarily unlikely, particularly where "replicating" Supplement CC's protections was impossible and LOA 12-05 expressly precluded the arbitrators from ordering much of the relief the TWA pilots sought.

Claim ten is that APA improperly objected to the TWA pilots' two procedural proposals. The TWA pilots have abandoned this claim by not pursuing it in their appellate brief. But in any event, the undisputed facts would preclude a finding of causation. The procedural proposals concerned *future* negotiations, and therefore had no bearing on *this* negotiation, the results

---

[120] That APA unfairly took sides is, of course, the premise of this lawsuit, and of claim nine in particular.

of which form the basis of the alleged injury. Further, the TWA pilots agree that they had a full and fair opportunity to respond to APA's objections.[121] But most compelling of all is that *the arbitrators disagreed with APA's objections*, which were jurisdictional, and ruled against the TWA pilots' procedural proposals on their merits.[122]

C.     *Remaining Claims*

Although I have now gone through the TWA pilots' entire complaint, they pursue several other claims in their brief. The first of these is that APA breached its duty of fair representation by failing to present an "institutional position against [AA]."[123] In effect, the claim is that LOA 12-05 was rotten from the start – and made rotten everything that followed – because APA acted in "brazen bad faith" by dividing the TWA and AA pilots into separate committees for arbitration.[124] Instead, the TWA pilots argue, APA should have resolved the differences between the two groups internally and then argued on their collective behalf in arbitration.

There are several problems with this theory, the most glaring of which is that it appears nowhere in the MSC. The bankruptcy court found that the TWA pilots raised it for the first time in their response to the defendants' motions for summary judgment and accordingly held it was

---

[121]
    APA SMF ¶ 86 [TWA Pilot App. 167].

[122]
    *Id.* ¶ 130.

[123]
    Appellant Br. 37.

[124]
    *Id.* at 39.

waived.[125] It is black-letter law that courts will not consider an argument raised for the first time in an opposition brief.[126] But to make matters worse, the TWA pilots do not challenge the bankruptcy court's waiver finding in their appellate brief. They therefore have waived their waiver argument.[127]

That problem aside, the TWA pilots would need to show that the bankruptcy court abused its discretion by declining to consider a theory raised for the first time in an opposition to summary judgment.[128] Even if it did, the TWA pilots then would need to show that APA acted in bad faith by dividing two conflicted groups into separate committees, each with its own representation and counsel.[129] As explained above, dividing union members into committees for arbitration involving a third party is, without more, not evidence of bad faith. The TWA pilots offer no compelling evidence of bad faith. Even construing the facts generously in their favor, the only reasonable inference to draw from APA's decision is that APA wanted to avoid the obvious litigation

---

[125]

Summary Judgment Op. at 25-26 [TWA Pilot App. 104-05].

[126]

*Wright*, 152 F.3d at 178.

[127]

*See, e.g., EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 625 (2d Cir. 2007) (holding the failure to raise an argument in an opening brief constitutes waiver).

[128]

*See, e.g., Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The District Court held that because the plaintiff had never asserted a claim of hostile work environment until her brief in opposition to the motion for summary judgment, it would not consider the claim. We agree with the District Court and will not address the merits of that late-asserted claim."); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) ("abuse of discretion").

[129]

The TWA pilots do not appear to argue that the decision was discriminatory or arbitrary. These arguments are thus waived, but in any event the decision was not discriminatory because it applied equally to both groups and was not arbitrary because APA clearly sought to mitigate the conflicts among the TWA and AA pilots.

risk that might arise from the forced marriage of the TWA and AA pilots.

The "institutional position" argument fails also for lack of causation. The undisputed facts demonstrate that the TWA pilots had a full and fair opportunity to raise their arguments at arbitration, and the arbitration panel rejected them largely because they fell outside the scope of LOA 12-05. The TWA pilots advance no compelling argument, and no reasonable jury could find, that any institutional position would have been similar to their own or resulted in better relief.

The second additional claim the TWA pilots advance is that APA failed to enforce LOA 12-05 in various ways. This claim undergirds many of those considered above and primarily recycles the allegation that LOA 12-05 bound APA to "replicate" the protections of Supplement CC. The TWA pilots point to cherry-picked statements, none from the text of LOA 12-05, that supposedly shed light on this reading.

As discussed at length, the "replicate" standard would impossibly require APA to build a protective fence around an airport base that soon no longer would exist. No reasonable jury could read LOA 12-05 as setting this goal, particularly as the word "replicate" appears nowhere in the LOA. The actual text states that AA and APA "agree that a dispute resolution procedure is necessary to determine what *alternative* contractual rights should be provided."[130] None of the statements APA points to contradicts this straightforward language. Many of them in fact bolster the theory that the parties agreed to negotiate for alternative protections.[131] In these circumstances, no reasonable jury could conclude that APA violated LOA 12-05 by not pushing for the "replicate"

---

[130]

AA SMF ¶ 5 (emphasis added).

[131]

*See* note 89, *supra*.

theory or that APA's failure to advocate for impossible relief caused the panel to reject it.[132]

III.    *The Bankruptcy Court Correctly Entered Summary Judgment for AA on the Collusion Claim.*

        The collusion claim against AA hinges on the existence of a breach of duty by APA.[133] As there was no breach, there was no collusion to commit a breach. Other than a lengthy string of citations supporting the rule that an employer can be held liable when it colludes with a union, the TWA pilots spend just four sentences asking for reversal on the collusion claim, the first of which admits that "[AA's] liability, if any, is derivative of APA's liability."[134] Their only real argument is that we should reverse here for the same reasons we should reverse with respect to AA.

        The TWA pilots state also, in half a sentence, "that the evidence shows that [AA] had knowledge of, and was complicit in, nearly all of the facts that demonstrate[] APA breached its [duty of fair representation]." This assertion is cursory and includes no citation to any supporting evidence. "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."[135] As the TWA pilots make no real argument that AA colluded with APA, I decline to make one for them.

---

[132]

        We need not reach the issue of whether APA had any duty to assert itself into the arbitration proceedings once it became apparent that AA did not read LOA 12-05 to require replication of Supplement CC.

[133]

        *See, e.g.*, *Flight Attendants in Reunion*, 813 F.3d at 475 ("Because the plaintiffs fail to state a claim for a breach of the duty of fair representation by [their union], the plaintiffs also fail to state a claim that [the employer] colluded in [the union's] breach.").

[134]

        Appellant Br. 57.

[135]

        *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

*Conclusion*

The judgment appealed from is affirmed.

SO ORDERED.

Dated:      October 2, 2019

_____

Lewis A. Kaplan

United States District Judge
